COURT OF APPEALS OF VIRGINIA

Present: Judges Fulton, Causey and Raphael
Argued at Lexington, Virginia

GEORGE CHRISTOPHER LILLY

                                            MEMORANDUM OPINION[*] BY
v.      Record No. 1220-23-3           JUDGE STUART A. RAPHAEL
                                                JULY 23, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Andrew S. Baugher, Judge

(Richard G. Morgan, on brief), for appellant. Appellant submitting
on brief.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

George Christopher Lilly held a power of attorney for his brother, Randy Lilly, who

suffered from Alzheimer's disease. Lilly appeals his five felony convictions for financially

exploiting Randy, a "vulnerable adult" under Code § 18.2-178.1. Lilly argues that the

Commonwealth failed to prove his guilt beyond a reasonable doubt. He says that he offered

benign explanations for most of his expenditures and that the rest were reasonable compensation

for caring for his brother. We find the financial-exploitation evidence sufficient to support the

convictions and therefore affirm the judgment.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard"

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

UNPUBLISHED

the defendant's evidence when it conflicts with the Commonwealth's evidence, "regard as true all the credible evidence favorable to the Commonwealth," and read "all fair inferences" in the Commonwealth's favor. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

*Randy Lilly's condition*

In 2012, when he was in his early sixties, Randy was diagnosed with Alzheimer's disease. Looking to the future, Randy signed a general durable power of attorney appointing Lilly as his agent if Randy became incapacitated.[1] Lilly testified that he did not read the document because he didn't want "to think about a time" when Randy's condition would worsen.

At first, the disease affected only Randy's vision. But it gradually impaired his ability to speak, walk, get out of bed, and use the bathroom. He began to hallucinate. In late 2018 or early 2019, Lilly quit his job at a news station and began to provide full-time care to Randy and their mother, moving into the family home. Their mother died in November 2019.

Randy's power of attorney granted Lilly the power "to do all acts, matters, and things in relation to all or any part of, or interest in, my property, affairs or business of any kind . . . that I could do if acting personally." Paragraph 7.5 entitled Lilly to "reasonable compensation" for his services and to "reimbursement for all reasonable costs and expenses actually incurred and paid." Paragraph 7.28 authorized Lilly "to make gifts, grants, or other transfers without consideration, either outright or in trust," but only pursuant to Randy's "then-existing testamentary plan."

By early 2020, Randy's condition had worsened. He could no longer shower, use the bathroom, or get dressed without Lilly's help. Lilly said that he eventually sought help from several caregivers, claiming that he often paid them using CashApp or PayPal.

---

[1] Lilly testified that the document "was created in 2012," but the document is signed and dated August 22, 2011.

*Investigation and indictments*

In February 2021, Adult Protective Services in Harrisonburg received a referral after Lilly applied for Medicaid benefits on Randy's behalf. A benefits worker flagged "unusual charges" on Lilly's bank statements. APS employee Dillon Cullers saw a lot of "red flags" in the financial records, noting "unusual charges," large cash outflows, and various "charges that didn't seem to be appropriate." Cullers saw that the medical records documented Randy's deteriorating condition. After an in-person visit with Randy and Lilly, Cullers referred the matter to the Harrisonburg Police Department.

Harrisonburg Police Detective Bradley Matthias began to investigate the possible misappropriation of funds from an incapacitated adult. Matthias reviewed bank records for Randy and Lilly's joint account from December 2019 through November 2021. He prepared a "brief summary of the transaction history" each month "to show the large amount of money . . . used on other things besides providing medical services to Randy." In December 2019 alone, Matthias discovered 10 deposits for more than $130,000 and almost 200 withdrawals of about the same amount. The deposits included $122,000 that Lilly obtained from cashing out Randy's life-insurance policy.

A similar pattern—many transactions leaving low balances—appeared on each monthly statement through August 2020 until the checking-account balance fell below zero in September 2020. Lilly showed a pattern of transferring money from Randy's savings account, and then "spending the majority of it" throughout the period examined by Matthias.

Randy died in May 2021.

In August 2021, Matthias interviewed Lilly, explaining his concerns. When asked about various CashApp and PayPal transfers, Lilly said they were payments to caretakers. But Lilly had no documentation or records for any of the expenditures. Matthias identified some

- 3 -

caretakers but discovered that they were not registered nurses, and one had been "arrested on felony warrants." Matthias could never confirm that any of those alleged caretaker payments were for legitimate services.

On July 18, 2022, the grand jury returned five indictments against Lilly under Code § 18.2-178.1 for financially exploiting a vulnerable adult. The indictments alleged the following expenditures, all greater than the threshold for grand larceny ($500 before July 1, 2020; $1,000 afterward)[2]:

- $130,000 in December 2019;

- $87,604.31 from January 2020 to June 2020;

- $30,000 from July 2020 to December 2020;

- $25,380.70 from January 2021 to June 2021; and

- $69,490.10 from July 2021 to October 2021.

*Lilly's trial*

At trial, Cullers and Detective Matthias testified to the facts set forth above. A demonstrative exhibit summarized monthly expenditures from Randy's accounts from December 2019 through October 2021. Matthias testified that many of the "transactions were not reasonable" and "weren't for the benefit of Randy." He noted particular concern about purchases at businesses like Etsy.com, the ABC store, phone providers, music shops, and a pool and spa company. Matthias found "excessive amounts" spent on such things as "craft stores" and "music shops"—purchases "that someone like Randy could not benefit from."

At the close of the Commonwealth's case-in-chief, the trial court denied Lilly's motion to strike but acknowledged there "[were] dots that need[ed] to be connected" in the

---

[2] *See* 2020 Va. Acts ch. 89 (raising grand-larceny threshold from $500 to $1,000, effective July 1, 2020).

Commonwealth's case. Still, the court found sufficient evidence "based on the amount of unusual expenditures that, according to the witnesses, would not have been for Randy's benefit based on his needs."

Lilly testified in his own defense. He said he hadn't received a paycheck as Randy's caregiver but that under the power of attorney, he would "share the funds [with Randy] and use them as . . . needed." He also testified that one of the caretakers who assisted him stole over $11,000 from his CashApp and then suddenly left. He said that several other large CashApp and PayPal payments were for other caretakers. Lilly claimed that several of the questioned expenditures were truly for Randy's benefit:

- $568.84 to Valley Pool & Spa for hot tub repair, ostensibly for water therapy for Randy;

- $554.08 for a "piece of musical equipment";

- gifts for Lilly's daughter that Randy would have wanted for her because the family was "very closeknit";

- $140.68 at the ABC store for "Christmas get-togethers";

- Netflix, Hulu, Prime Video, YouTube, and cable subscriptions;

- $278.82 to eBay and $126.78 to the Factory Antique Mall, supposedly because Randy "loved antiques";

- $379.04 to Guitar Center, because Lilly played guitar for Randy;

- $135.84 to Reverb.com for a sound generator Lilly said he used for sound therapy;

- another $654.99 to Reverb.com for "music gear"; and

- car insurance and landscaping payments.

Lilly claimed that, although Randy's impaired vision prevented him from watching television, Randy liked to "listen" to the extensive subscription programming that Lilly purchased. Lilly defended his other purchases—from vendors like Amazon, eBay, and Etsy—as "compensation" for caring for Randy, who needed "non-stop" care "seven days a week."

On cross-examination, the Commonwealth questioned Lilly about particular purchases, including payments to individuals whom Lilly could not remember. The court itself asked about many other purchases, but Lilly could not explain how the spending benefitted his brother.

The court denied Lilly's renewed motion to strike. In closing argument, Lilly insisted that he had given "a rational reasonable explanation" for all big expenditures that were "not particularly unusual." He claimed that anything else "not exclusively for Randy's benefit was reasonable compensation."

The trial court disagreed and found Lilly guilty on all five indictments. Although the Commonwealth's evidence "didn't quite live up" to the tens of thousands of dollars charged in the indictments, the Commonwealth had "proven enough" improper transactions to exceed the grand-larceny threshold for each period:

- On Indictment #1 (January 2020 to June 2020), Lilly misappropriated $500 on music purchases and other purchases for his "personal" benefit, not for Randy;

- On Indictment #2 (December 2019), Lilly misappropriated $500 or more in payments to the ABC store and the Virginia DMV, and payments for internet services, phone bills, and shopping sites;

- On Indictment #3 (July 2020 to December 2020), Lilly misappropriated $1,000 on subscription services, car purchases, music equipment, and pawn-shop purchases. Those purchases were all for Lilly's "personal benefit"; and

- Lilly misappropriated $1,000 during each period charged on Indictments #4 (January 2021 to June 2021) and #5 (July 2021 to October 2021). "The substantial music equipment purchases alone" exceeded the grand-larceny threshold.

The trial court excluded from its calculation items that "could be considered legitimate home expenses." So the court did not include in the misappropriation figure Lilly's payments for "home improvement stores, landscaping, and Valley Pools."

The court rejected Lilly's claim that everything else Lilly transferred from Randy's accounts was reasonable compensation for caregivers. Lilly was not "credible on that point." The court cited Lilly's "absolute absence of any recordkeeping"—Lilly produced "no invoices, no hours expended, no hourly rates." And Lilly was "inconsistent [about] the multiple times he chose to pay himself directly." Lilly's credibility was also undermined when he claimed that $11,000 of Randy's money had been stolen, yet Lilly did nothing about it. Lilly's "lack of memory" and inability to identify specific purchases further discredited his account.

The trial court sentenced Lilly to a year of incarceration on each of the five convictions, all suspended; one year of supervised probation; and 100 hours of community service under the supervision of a probation officer. Lilly noted a timely appeal.

ANALYSIS

Lilly argues that the trial court should have granted his motion to strike because he was able to "specifically explain how most of the transactions . . . were for the benefit of his brother," and the remaining transactions were "reasonable compensation" for Lilly's services. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). We give "deference to the fact finder's assessment of witness credibility." *Washington v. Commonwealth*, 75 Va. App. 606, 615 (2022). "[T]he relevant question is whether '*any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

Code § 18.2-178.1 criminalizes the financial exploitation of vulnerable adults, defining the crime as a form of "larceny." Code § 18.2-178.1(B).

> It is unlawful for any person who knows or should know that another person is a vulnerable adult to, through the use of that other person's impairment, take, obtain, or convert money or other thing of value belonging to that other person with the intent to permanently deprive him thereof.

*Id.*; *see also* Code § 18.2-95 (defining grand larceny). The prohibition does not apply to transactions for "which the accused acted for the benefit of the vulnerable adult or made a good faith effort to assist such person with the management of his money or other thing of value." Code § 18.2-178.1(D).

As the trial court acknowledged, the power of attorney "complicates" things. But not enough to warrant reversal. The court gave due consideration to the power of attorney, particularly Lilly's ability to receive and pay reasonable compensation for services and to make gifts. The court also "ruled out" legitimate expenses for home improvement, landscaping, and maintaining the pool.

Still, the court found that the Commonwealth proved enough wrongful expenditures to meet the dollar threshold for grand larceny on each indictment. Those findings are not plainly wrong or without evidence to support them. Considering Detective Matthias's testimony along with the summary expenditure reports, a rational factfinder could conclude that Lilly spent more than the grand-larceny threshold on things for his personal benefit during the period charged in each indictment.

The trial court also acted well within its discretion in finding that Lilly's testimony was not credible. The court gave multiple reasons for discrediting Lilly's account, including Lilly's

inability to remember or explain many of his expenditures, his failure to provide any "recordkeeping" to document payments to caretakers or to himself, and his failure to take any action if, as Lilly claimed, one of those caretakers had stolen $11,000 from Randy. "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Maust v. Commonwealth*, 77 Va. App. 687, 703 (2023) (en banc) (alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011)). The trial court's findings here were not plainly wrong. And the "fact-finder, having rejected [the] defendant's attempted explanation as untrue, may draw the reasonable inference that his explanation was made falsely in an effort to conceal his guilt." *Id.* (quoting *Covil v. Commonwealth*, 268 Va. 692, 696 (2004)).

## CONCLUSION

The evidence sufficed for the trial court to find beyond a reasonable doubt that Lilly committed five violations of Code § 18.2-178.1(B) by misappropriating funds that belonged to his incapacitated brother.

*Affirmed*.